MORRIS v. JOHNSTON, Commanding General, Camp Lewis.

(Circuit Court of Appeals, Ninth Circuit. October 18, 1919.)

No. 3355.

ESTOPPEL ⊂62(5)—JURISDICTION TO SUBJECT RESIDENT ALIEN UNDER SELECTIVE DRAFT ACT NOT LOST BY ESTOPPEL OR WAIVER.

Jurisdiction to subject a resident Canadian registrant to the draft *held* not lost by estoppel or waiver, because after his exemption under the first call, afterward revoked, he was sent back to Canada by the immigration authorities as having unlawfully entered, where he returned on a permit and remained until after the Canadian-American Convention went into effect.

Appeal from the District Court of the United States for the Western District of Washington; Edward E. Cushman, Judge.

Habeas corpus by Bernard Patrick Morris against Maj. Gen. W. H. Johnston, Commanding General, Camp Lewis, Wash. Judgment denying writ, and petitioner appeals. Affirmed.

This was an appeal from an order of the District Court of the United States for the Western District of Washington, Southern Division, on a writ of habeas corpus, denying the discharge of the appellant, who was held as a deserter by the military authorities at Camp Lewis, Wash. The facts material to be considered may be thus stated:

The appellant, a British subject, born in Canada, August 21, 1890, entered the United States through the port of Marcus, Wash., in November, 1915, stating to the immigration officials that he was on the Seattle hockey team, and that he was coming to this country temporarily to play a few games of hockey and would then return to Canada. He remained in the United States, and on June 5, 1917, he registered under the Selective Draft Act (Act May 18,

1917, c. 15, 40 Stat. 76 [Comp. St. 1918, §§ 2044a–2044k]), with local board No. 6, in the city of Seattle, giving his residence as 616 Seneca street, in that city, and was by that board given order No. 123 and serial No. 1066. He filed his claim of exemption before that board on the ground that he was an alien, which claim was denied by the local board. On October 3, 1917, appellant was due to appear before the local board for physical examination; his claim for exemption as an alien having been denied by that board, and his appeal not having been passed on by the district board. Before the hour fixed for the physical examination, appellant applied at the office of the district board and was informed that his appeal would be immediately acted upon, and on the same day his exemption was allowed, and the certificate of exemption on form 159 was issued to him.

Morris thereupon communicated with Whitney, the chairman of the local board, and advised him that the district board had granted his exemption whereupon Whitney instructed the arresting officer to release him, but instructed Morris to appear at the office of the local board on the morning of October 4th. When Morris reported, he was told by Whitney to report to the United States immigration officer at Seattle, for the purpose of being examined as to his right to remain in the United States. Morris reported to Sargent, the immigration officer, and after examination as to being unlawfully in the United States and subject to arrest and deportation, he thereupon asked Sargent not to issue any warrant, stating that he would return of his own accord to Canada. Sargent assented to this, and directed Morris to report his return to Canada to the United States immigration officer at Vancouver, B. C., and Morris reported to this officer on November 3, 1917. On the same day he reported to the officer in Vancouver, Morris applied for permission to leave Canada for a month and was granted a permit. This permit was extended from time to time, and on it Morris made several trips to the United States, the last of which appears to have been made August 17, 1918.

In December, 1917, the second draft, governed by a new set of rules, began. These regulations revoked all exemptions and discharges made prior to December 15, 1917, and provided that a questionnaire should be sent every man who had registered on June 5, 1917, who had not actually been inducted into the military service. A questionnaire was duly mailed to Morris at the address given by him, and which he had never changed by any communication to the local board. This questionnaire was received by Morris, and on its receipt he took it to the office of the local board and asked Whitney if he had to fill it out, and was informed that the board held that it was his duty to do so. He then informed Whitney that he was in the United States on a limited time permit of the Canadian authorities, and was informed by Whitney that he must fill out the questionnaire and comply strictly with the law. Morris protested, but filled out his questionnaire and swore to it, and again claimed his exemption as an alien. The local board again denied the claim of exemption, and on January 9, 1918, Morris again appealed to the district board, which on January 16, 1918, granted his exemption and placed him in class V–F, resident alien, not enemy.

This exemption of Morris as an alien, class V–F, continued in effect down to July 28, 1918, when the Canadian-American Convention (40 Stat. 1624) went into effect. Article 1 of this convention provides that all Canadian subjects, in the United States on the date the convention became effective, "shall, unless before the time limited by this convention they enlist or enroll in the forces of their own country, or return to the United States or Canada, respectively, for the purpose of military service, be subject to military service and entitled to exemption or discharge therefrom under the laws and regulations, from time to time in force, of the country in which they are."

Article 2 of the convention provides: "Americans and Canadians within the age limits aforesaid who desire to enter the military service of their own country must enlist or enroll or must leave Canada or the United States, as the case may be, for the purpose of military service in their own country, before the expiration of 60 days after the date of the exchange of ratifications of this convention, if liable to military service in the country in which they are at the said date, or, if not so liable, then before the expiration of 30 days after the time when liability shall accrue."

Acting under this convention and the regulations issued for its enforcement, the local board, on September 28, 1918, reclassified Morris and placed him in class A–1; mailed him a notice of his reclassification under the convention under date of October 3, 1918, and an order to report for physical examination on October 8, 1918. Morris testified that he never received any of these notices and failed to report for examination, and was thereupon reported to the state executive officer as a delinquent. That officer mailed him an order to report for induction at Olympia on November 5, 1918, failing which he would become a deserter. Morris claimed that he did not get this notice, and, failing to report, was declared a deserter, and a reward offered for his arrest. On March 5, 1919, Morris was arrested as a deserter, taken before the local board, given an examination, and committed to the military authorities as a willful deserter.

Believing that he was illegally restrained, Morris on March 19, 1919, filed his petition for a writ of habeas corpus, which was heard before Hon. Edward E. Cushman, District Judge, and an order was entered denying the writ, and an appeal was taken to this court. Subsequently the counsel for the respective parties entered into the following stipulation:

"It is hereby stipulated and agreed between the petitioner and respondent, by their respective counsel, that the sole question involved in this appeal is whether the acts of the two executive agencies of the United States government, to wit, local board No. 6, Seattle, Washington, and the United States Commissioner of Immigration at Seattle, Washington, during the months of August to November 1917, inclusive, with respect to petitioner, canceled his registration and released and discharged said petitioner from all duties and obligations whatsoever under the act of Congress of May 18, 1917, entitled 'An act to authorize the President to increase temporarily the military establishment of the United States,' and all acts, resolutions, and conventions amendatory thereof and supplementary thereto, and all rules and regulations prescribed by the President of the United States under the authority contained in said act.

"It is further stipulated and agreed that, if the acts of the two executive agencies of the United States as aforesaid did not cancel said registration of petitioner and release and discharge him from all duties and obligations whatever under the Selective Service Act aforesaid, then he was, for the purposes of this case, duly and regularly inducted into the military service, and was properly and legally in the custody of respondent herein, at the time of the filing of said petition and the hearing of said cause."

Both the petition for the writ and the return are unduly prolix and contain much of the evidence instead of the ultimate facts.

Albert Moodie, of Seattle, Wash., for appellant.

Annette Abbott Adams, U. S. Atty., and Charles W. Thomas, Asst. U. S. Atty., both of San Francisco, Cal., for appellee.

Before GILBERT and HUNT, Circuit Judges, and SAWTELLE, District Judge.

SAWTELLE, District Judge (after stating the facts as above). Pretermitting for the present the question whether this court is bound by the stipulation entered into by counsel, we will consider the question as thus presented.

The contention of the appellant is that the United States is estopped by the acts of Whitney and Sargent in causing Morris to leave the United States to escape deportation, and that because of such action the registration of Morris was canceled and he was released of all duty to the United States. It is beyond question that Morris entered the United States illegally and that he was subject to arrest and deportation. It is equally beyond dispute that on June 5, 1917, when he

was registered, he was subject to all rules and regulations made to execute the Draft act.

Section 5 of that act (Comp. St. 1918, § 2044e) provides:

"That all male persons between the ages of twenty-one and thirty, both inclusive, shall be subject to registration in accordance with regulations to be prescribed by the President, * * * and all persons so registered shall be and remain subject to draft into the forces hereby authorized, unless exempted or excused therefrom as in this Act provided."

It is thus clear that on June 5, 1917, Morris was, subject to the provisions of the act, liable to registration, and by the express terms of the act he remained subject to draft, unless exempted or excused therefrom as provided by the act. There is no claim that he was exempted or excused, as provided in the act. The contention is that by the acts of its executive agencies the government of the United States has estopped itself to demand compliance with its laws and absolved Morris of his duty to respect and obey them. The estoppel is sought to be based on the idea that Whitney and Sargent, by their actions, waived for the United States the undoubted jurisdiction of the local board over Morris, and that this jurisdiction, thus waived, is gone forever. The fact seems to be ignored or forgotten that Whitney had neither the duty nor the power to order the deportation of Morris. It is equally evident that Sargent had no duty to perform and no authority conferred upon him by the Selective Draft Act; his duties and powers were derived from the immigration laws of the United States, and it was because Morris had violated these laws that he was subject to arrest and deportation.

Coming here in violation of the immigration laws conferred upon Morris no immunity from the requirement to register under the Selective Draft Act. All that was necessary to impose upon him the duty of registering was that he was a resident of the United States, of military age, and that he was such resident by his own act on June 5, 1917, is beyond question. Having thus registered, he became subject to all the duties and responsibilities imposed by law upon residents. His rights to exemption and discharge could then only be secured by the means and in the manner sanctioned by that act, and they were unaffected by any action which might be taken under other laws, unless such action put and kept him beyond the reach of the laws of the United States. No action of the immigration officer in the enforcement of the immigration laws went further than to send him back to Canada. He did not stay there, for on the very day that he reached Canada he applied for and obtained a permit by virtue of which he returned to the United States.

It is a fundamental principle of estoppel, even between individuals, that the acts relied on to create estoppel must be done by persons authorized or apparently authorized to do such acts, and in the exercise of duties or rights which clearly belong to them, and must be acted on by the party claiming the estoppel in good faith, and the situation must be such that it would be inequitable to allow the right asserted by the party estopped to be then enforced.

Tested even by the principles of estoppel which apply between individuals, the facts set up by petitioner fall short of showing a case in his favor. First, Whitney had neither authority nor duty to deport him. He was powerless as chairman of the local board to order his deportation. Neither he nor the board had any power or duty in regard to the enforcement of the immigration laws, and their jurisdiction was complete under the Draft Act. The petitioner had voluntarily put himself within its influence, and his rights and his duties, so far as military service due the United States are concerned, were to be weighed and determined by the terms of that act and the instrumentalities created by it.

It is also to be noted that the act of the immigration officer in causing Morris to return to Canada in no wise forbade him to return to the United States in a proper manner, and that in spite of such compulsion to return to Canada we find him, on the very day he arrives there, making preparations for his legal return to the United States and returning at times to suit his convenience.

The action in sending him to Canada did not deprive him of any means or opportunity to have his rights and duties determined by the Selective Draft Act, and we find him cognizant of and using these instrumentalities after his voluntary return, for when his questionnaire was answered and the local board again held his claim of exemption invalid, he again appealed to the district board and it again declared him to be exempt, and he again accepts and uses the certificate of exemption. Having thus claimed and used the exemption thus secured, he cannot now repudiate the authority whose protection he then sought. His situation then was of his own choosing; he was claiming and receiving the benefit of the exemptions of the Selective Draft Act, and it was only when his situation was changed by the Canadian-American Convention, and he found the means provided by the Selective Draft Act insufficient to longer protect him in his claim of exemption, that he seeks to avoid his obligations to the law whose protection he had invoked and obtained. This lacks every element of good faith.

The enforced return of Morris to Canada and his return to the United States in a legal way in no wise changed to his hurt his relations to his obligations of military service to the United States. He had and exercised the same rights which he would have had if he had been permitted to remain, and he was subject to no duty or responsibility which would have been his, had he remained undisturbed in this country, and thus the claim that his status was changed to his hurt is shown to be without foundation.

Counsel for appellant has called our attention to various cases which discuss the doctrine of estoppel with regard to the title and claim of property, but he cites none where it has been decided that the government of the United States is estopped to use its governmental powers by the acts of its agents. Great stress is laid on the case of United States v. Willamette Valley & C. M. Wagon Road Co. (C. C.) 54 Fed. 807. That case involved the title to certain lands granted by Congress in aid of a road, and sought to cancel certain patents issued by the

United States. Speaking of the doctrine of estoppel, as applied to the government of the United States, Judge Gilbert said:

"The government is not ordinarily bound by an estoppel. While individuals may be estopped by the unauthorized acts of their agents, apparently within the scope of their agency, the sovereign power, being the trustee of the people, is rarely, if ever, bound by the acts of its agents; but, while it is true that for the neglect or the illegal or unauthorized acts of its agents the government should not ordinarily be estopped to show the truth, there is good authority, based upon sound reasoning, to support the doctrine that where the government has acted by legislative enactment, resolution, or grant, or otherwise than through the unauthorized or illegal acts of its agents, and the parties dealing with the government have relied upon the same, and in good faith have so changed their relation to the subject-matter thereof that it would be inequitable to declare such action or grant illegal, the government will be estopped."

Thus by the very authority cited by appellant it is shown that the government is not estopped by the unauthorized acts of Whitney and Sargent set up in his petition. If this be true in a case where only property rights are involved, how much more must it be true where there is involved the right of the government to compel a resident to perform military duty while the country is engaged in war.

The Selective Draft Act, and the rules and regulations made under its authority, must furnish the only standard by which the powers of the government are to be measured, and the instrumentalities created by that act must be free from interference by the courts until it clearly appears that the party complaining has been deprived of some right which flows to him from the constitution and laws of the United States.

The court feels constrained to hold that the acts set up in the petition, even if true, would furnish no ground for holding that the government was estopped to assert any lawful power conferred upon it by the Selective Draft Act, or release the appellant of the duties he owed under that act.

The facts set up must be considered in the light of the conditions which surround them. This country was at war. It was marshaling its man power for the purpose of carrying on that war. Upon the instrumentalities created by the Selective Draft Act was devolved the duty of carrying out this purpose, and these instrumentalities were given power commensurate with the duty imposed upon them. They were intended to be the tribunals before which any person called on to render military service could have determined the extent of the liability he was under to perform such service. The alien who chose to seek residence here had his rights declared by the act and the regulations, and had the right to appeal to these instrumentalities for their ascertainment and enforcement.

It was not declared or contemplated that any decision of any of these tribunals would create a vested status, which would not yield to changed conditions of service or exemption, and the right of the government to change either the rules of exemption or to enlarge the classes of residents who became liable to render these services was neither limited nor defined.

It is beyond question that the appellant was of military age and did not choose to join the forces of his native land. He did choose to come to the United States and make his residence here, and his claim of exemption had been rejected. By the terms of the Canadian-American Convention he was liable to service in the United States, and it must be held that he is accountable to its laws, and subject to the jurisdiction of the instrumentalities provided for their enforcement.

The result is that the District Court did not err in its judgment and order, and its action is affirmed.